**Affirmed and Opinion filed July 10, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00014-CV

---

**VILLAGE OF TIKI ISLAND, VILLAGE OF TIKI ISLAND BOARD OF ALDERMEN, VERNON "GOLDIE" TELTSCHICK, TOM FISHER, RON SIMONS, KAREN HEARRING, WAYNE CROZIER, AND FREDDIE CARMICHAEL, Appellants**

**V.**

**PREMIER TIERRA HOLDINGS INC., Appellee**

---

**On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Cause No. 16-CV-0828**

---

### O P I N I O N

In this land-use case, a city, its mayor, its board of aldermen, and the board's members appeal the trial court's denial of their plea to the jurisdiction filed in response to a property owner's declaratory judgment action and takings claim concerning the property owner's vested rights in a marina development project the city has repeatedly refused to approve. We affirm.

FACTUAL BACKGROUND

The plaintiff in this case is Premier Tierra Holdings, Inc. (Premier). Premier owns a tract of property (the Property) in the Village of Tiki Island (the City), a general-law municipality in Galveston County. Since 2009, Premier has sought to develop or sell the Property for a mixed-use marina development project to include, among other things, residences and elevated dry boat storage (the Project).

Prior to Premier's acquisition of the Property, the International Bank of Commerce (IBC) made a loan secured by the Property to an entity controlled by Namir Faidi. Faidi proposed the construction of ninety-foot-high structures containing 240 residential condominium units on the Property, along with a redeveloped marina that would provide elevated boat storage. Construction commenced on the project, but it was destroyed during Hurricane Ike. The project subsequently failed, and Faidi's development ceased.

IBC foreclosed on the Property in early 2009 and conveyed it to Premier, and affiliate of IBC. Premier paid $5.7 million to IBC by inter-company transfer, and in return received the Property.

On April 22, 2010, Premier submitted a plat application to the City reflecting the Project's plan of development, which included up to one hundred residential units and up to 250 dry stack enclosed boat slips. At the time the plat application was filed, the City had no meaningful land-use regulations. The City also had no subdivision platting or zoning ordinances or any general or comprehensive plan that would prohibit the Project.

Five days later, on April 27, 2010, the City approved a new zoning ordinance (the Ordinance). The Ordinance (1) prohibits dry boat storage and apartment property classifications anywhere on the Property; (2) limits heights of

2

structures and imposes setbacks; (3) prohibits rentals of less than thirty days; and (4) requires minimum parking depending on the property classification.

The Ordinance's stated purpose is to "zone the entire area of the [City] into districts" in order to "provide the [City] with a comprehensive plan for the purpose of promoting health, safety, and the general welfare of the residents of [the City]." The Ordinance was in part "designed to: (1) Insure safety from fire, hurricanes, and other dangers, [and] (2) To preserve the character of the [City], its peculiar suitability for particular uses, and with a view of conserving the value of the [City] and encouraging the most appropriate use of land throughout the [City]." Premier believes the Ordinance was specifically adopted in an effort to prevent it from developing enclosed dry boat storage.

The City's governing body, the Board of Aldermen (the Board) rejected Premier's plat application on May 18, 2010. Premier attempted to negotiate with the City to obtain approval for the Project, but its attempts were unsuccessful.

Premier then sued the City, seeking declarations that its rights in the Project vested on April 22, 2010, when it filed the initial plat application, and that it was not required to comply with later-enacted zoning ordinances. *See Vill. of Tiki Island v. Premier Tierra Holdings, Inc.*, 464 S.W.3d 435, 440 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that a permit applicant's rights under chapter 245 accrue "on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought" and are commonly referred to as "vested rights") (quoting Tex. Loc. Gov't Code § 245.002(a-1)).

In response, the City filed a plea to the jurisdiction. The trial court denied the City's plea, and the City filed an interlocutory appeal in this court. *Id*. at 438.

3

In the first appeal, the City did not dispute Premier's assertion that its 2010 plat application triggered the application of chapter 245 to the Project, or that the City had no zoning ordinances at the time Premier filed its plat application. *Id*. at 440. This court concluded, however, that Premier's declaratory judgment action failed to present a justiciable controversy because: (1) the record did not disclose the reasons why the City denied the 2010 plat application; (2) Premier never requested that the City certify the reasons for the denial (as provided in chapter 212 of the Local Government Code); (3) no plat or permit applications had since been denied for any specified reasons; and (4) Premier did not challenge the City's denial of its plat application in any proceeding, including this one. *See id*. at 440–41, 442. Consequently, any injury that Premier allegedly suffered or would suffer in the future was not ripe because Premier "failed to allege or demonstrate that any official action by the City has caused its alleged injuries." *Id*. at 442.

As this court explained, "Premier may have vested rights in the project, but there is no context within which to declare what they are. Any such declaration would be a prohibited advisory opinion that would not resolve the parties' dispute." *Id*. at 443. We sustained the City's plea to the jurisdiction and dismissed Premier's case without prejudice. *Id*.

In May 2015, after this court's opinion issued, Premier submitted a rezoning application under protest in the form of a "Planned Unit District" (PUD).[1] At a public hearing before the City's Planning and Zoning Commission, Premier received negative feedback on the dry boat storage, including fire safety concerns.

---

[1] As explained in *Tiki Island*, in 2010, at Premier's request, the City revised the ordinance to provide for approval of a PUD to accommodate certain aspects of the Project. 464 S.W.3d at 437. Despite subsequent negotiations for a reduced scale version of the Project as a PUD, in 2011 it became apparent to Premier that the City would not approve the reduced scale version. *See id*. at 437–38.

4

Premier worked with the City's fire marshal to address the fire safety concerns, and hired an expert to prepare a fire study and a deliverable report termed a Life Safety and Code Analysis (the Safety Analysis). Because the Safety Analysis would take several weeks, Premier asked that the City defer its decision on Premier's PUD application until the Safety Analysis would be available for its consideration, but the City refused. According to Premier, the City did so because it "did not want any facts to get in the way." The City's Board unanimously denied the PUD application on March 15, 2016.

After the City denied Premier's PUD application, Premier requested certified reasons for the City's 2010 denial of Premier's original plat application. The City issued certified reasons on April 19, 2016. Among other things, the City asserted that the 2010 plat application did not conform to "the general plan of the City and its current and future streets, alleys, parks, playgrounds, and public utility facilities."

On June 22, 2016, Premier submitted a second revised plat under protest to address the City's cited items, which the City denied on July 7, 2016. Premier requested certified reasons for this denial. The City certified its reasons on August 16, 2016. The reasons given were similar to those provided on April 19.

Premier submitted a third revised plat application under protest on November 9, 2016. The City again denied the revised plat application—this time after less than a week, on November 15, 2016. Premier requested certified reasons for this denial, which the City provided. Again, the reasons given were similar to those previously provided.

Premier asserts that in each certification, the City cited to items that did not exist at the time the Project vested on April 22, 2010, or are irrelevant to normal plat consideration and requirements. Premier could not file an administrative

5

appeal of the City's repeated denials of it plat applications, however, as the City provides no such procedure. *See id.* at 442 n.3.

Premier then filed a "Second Amended Petition and Application for Writ of Mandamus" in the trial court. This petition included a request for a declaratory judgment concerning its rights in the Project and a takings claim. In its request for mandamus relief, Premier asked the trial court to compel the Board to perform its ministerial duty to approve the original plat and each of the subsequent plats because they satisfied all applicable and duly adopted platting regulations. Premier attached to its petition its initial and successive plat applications and the City's certifications of reasons for denying the plat applications. In addition to naming the City, Premier added as defendants the Board, the Board's members, and the City's mayor (collectively, the City Parties).[2]

The City Parties responded with an amended plea to the jurisdiction, arguing that the trial court lacked jurisdiction over Premier's declaratory judgment claim because the City's certified reasons for denying Premier's Project demonstrate that the Project was denied based on existing regulations rather than the subsequently enacted Ordinance, and therefore no justiciable controversy existed concerning the application of chapter 245. The City Parties also argued that Premier failed to state a viable takings claim. The City Parties did not challenge the trial court's jurisdiction over Premier's request for mandamus.

After considering the parties' briefing and arguments, the trial court denied the City Parties' plea to the jurisdiction on September 22, 2017. This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

---

[2] The defendant Board members are Tom Fisher, Ron Simons, Karen Hearring, Wayne Crozier, and Freddie Carmichael, all of whom are sued in their official capacity only. The City's mayor, Vernon "Goldie" Teltschick, is sued in both his individual and official capacity.

**ANALYSIS OF THE JURISDICTIONAL ISSUES**

In its first issue, the City Parties contend that the trial court erred in denying its plea to the jurisdiction because Premier failed to plead a justiciable controversy as to Premier's request for declarations of its rights under chapter 245 of the Local Government Code. In its second issue, the City Parties contend that Premier failed to plead a viable takings claim. We address each in turn.

## I. Premier's Request for Declaratory Judgment

In its first issue, the City Parties contend that the trial court erred in denying the City's plea to the jurisdiction as to Premier's declaratory judgment action for two reasons. First, the City Parties argue that Premier has not pleaded a claim to which chapter 245 applies. Second, the City Parties argue that the declarations Premier seeks are not ripe for review.

### A. Standard of Review and Applicable Law

Subject matter jurisdiction is essential to a court's authority to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Governmental immunity from suit defeats a trial court's subject matter jurisdiction, and is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). We review a trial court's ruling on a plea to the jurisdiction de novo. *Id*. at 226.

"In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The plaintiff must allege facts that affirmatively establish the trial court's subject matter jurisdiction. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. In determining whether this burden has been satisfied, we must construe the pleadings liberally in the plaintiff's

favor and look to the pleader's intent. *Miranda*, 133 S.W.3d at 226.

If the governmental entity challenges the plaintiff's jurisdictional allegations, then the plaintiff must adduce some evidence to support jurisdiction. *See id.* at 227–28. The trial court then considers the relevant evidence submitted by the parties. *Id.* at 227. If the evidence creates a fact question regarding jurisdiction, then the trial court must deny the plea, and the fact issue will be resolved by the fact finder. *Id.* at 227–28. But if the evidence is undisputed, then the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

Under the Uniform Declaratory Judgments Act, a person whose rights, status, or other legal relations are affected by a statute or municipal ordinance may have determined any question of construction or validity arising under the statute or ordinance and "obtain a declaration of rights, status, or other legal relations thereunder." *See* Tex. Civ. Prac. & Rem. Code § 37.004(a). A declaratory judgment is appropriate when a justiciable controversy exists concerning the rights and status of the parties and the controversy will be resolved by the declaration sought. *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 681 (Tex. App.—Austin 2004, no pet.) (citing *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). To constitute a justiciable controversy, there must exist a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *Id*.

Ripeness is a threshold issue that implicates subject matter jurisdiction and also emphasizes the need for a concrete injury for a justiciable claim to be presented. *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). In evaluating ripeness, we consider whether, when the lawsuit was filed, the facts were sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Robinson v.*

8

*Parker*, 353 S.W.3d 753, 755 (Tex. 2011). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Save Our Springs Alliance*, 149 S.W.3d at 683 (citing *Patterson*, 971 S.W.2d at 442). We examine both the fitness of the issues for judicial decision and the hardship occasioned by the court's denying judicial review. *Id.*

Chapter 245 of the Texas Local Government Code creates a system by which property developers can rely on a municipality's land use regulations in effect at the time the original application for a permit is filed. *See Tiki Island*, 464 S.W.3d at 439. Section 245.002 of that chapter establishes a general rule that municipal regulatory agencies must consider a permit application under the terms of the ordinances, rules, and other applicable regulations that are in effect at the time a permit, development plan, or plat application is filed:

> Each regulatory agency shall consider the approval, disapproval or conditional approval of an application for a permit **solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements** in effect at the time (1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or (2) a plan for development of real property or plat application is filed with a regulatory agency.

Tex. Loc. Gov't Code § 245.002(a) (emphasis added). The rights to which a permit applicant is entitled accrue "on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought." *Id.* § 245.002(a–1).

In effect, chapter 245 "freezes" the rules at the time the original application for a permit is filed, and limits the rights of a city to "change the rules in the middle of the game." *Vill. of Tiki Island*, 464 S.W.3d at 440 (quoting *Harper Park Two, LP v. City of Austin*, 359 S.W.3d 247, 249–50 (Tex. App.—Austin 2011, pet.

9

denied). However, chapter 245 contains a number of exemptions from its operation, including certain municipal zoning regulations and other specified land-use regulations. *See* Tex. Loc. Gov't Code § 245.004. A city also may require compliance with technical requirements relating to the form and content of a permit application in effect at the time the application was filed, even though the application is filed after the date an applicant's rights accrue. *See id.* § 245.002(f).

Chapter 245 expressly authorizes enforcement of its provisions through a request for declaratory relief. *Id.* § 245.006(a). Further, a municipality's immunity from suit is expressly waived in regard to an action under chapter 245. *See id.* § 245.006(b).

### B.     Application of Law to Facts

#### 1.     *Premier has pleaded a claim to which chapter 245 applies.*

According to the City Parties, Premier has not pleaded a claim to which chapter 245 applies because Premier alleges that the City Parties used the subsequently enacted Ordinance to interfere with Premier's vested rights, but the City Parties maintain that they could not, and did not, deny the plat application based on the Ordinance. Rather, the City Parties assert that the City's certifications reflect that the City denied the plat application based on "existing regulations," which is permissible under chapter 245. Because the City Parties did not violate chapter 245, they reason, Premier does not plead a claim to enforce chapter 245, and therefore the City Parties' immunity is not waived under that chapter.

Premier responds that the City Parties ignore the ongoing dispute over whether Premier has a vested right to develop the Project with dry boat storage and apartments under the City's regulatory scheme at the time of vesting and fails to acknowledge the allegations in Premier's second amended petition.

10

In its petition, Premier alleges that when it submitted its initial plat application in 2010, the City had no meaningful land use regulations, no subdivision platting or zoning ordinances, and no general or comprehensive plan. A letter from Premier's surveyor, submitted to the City with Premier's initial plat application, reflects as much:

> This plat is required by Texas law, but the Village has no subdivision platting ordinance, zoning ordinance, general plan or comprehensive plan, so I have followed the Texas Subdivision Statute (Texas Local Government Code Chapter 212) in preparation of the plat. This plat complies with requirements as a final plat, and is in recordable form.

Accordingly, Premier asserts that under sections 245.002(a) and 245.002(a–1), its vested rights accrued upon filing, so long as there was fair notice of the Project and the nature of the permit sought.[3] *See id*. § 245.002(a), (a–1).

The City Parties do not dispute that Premier's rights in the Project vested upon filing. Nor do the City Parties deny that they had fair notice of the Project sought and the nature of the permit Premier requested. Further, the City's certified denials reflect the City Parties' understanding that Premier intended to develop the Project with residences and dry boat storage. The City Parties also do not dispute that chapter 212 of the Local Government Code (which Premier's surveyor indicated he followed in preparing the plat) was applicable to the plat. In relevant part, section 212.010 provides that a municipal authority responsible for approving plats shall approve a plat if:

> (1) it conforms to the general plan of the municipality and its current and future streets, alleys, parks, playgrounds, and public utility

---

[3] Chapter 245 defines a "project" as an endeavor over which a regulatory agency exerts its jurisdiction "and for which one or more permits are required to initiate, continue, or complete the endeavor." Tex. Loc. Gov't Code § 245.001(3). Likewise, a "permit" is defined as a form of authorization "that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought." *Id*. § 245.001(1).

facilities; [and]

(2) it conforms to the general plan for the extension of the municipality and its roads, streets, and public highways within the municipality and in its extraterritorial jurisdiction, taking into account access to and extension of sewer and water mains and the instrumentalities of public utilities[.]

*See id*. § 212.010(a)(1)–(2).

Indeed, the City relied on section 212.010 in denying Premier's initial plat application based on an allegedly preexisting "general plan." Specifically, the first reason cited in the City's certification of its reasons was that the plat "does not conform to the general plan of the City and its current and future streets, alleys, parks, playground, and public utility facilities as provided by Section 212.010." Similarly, in the City's certified reasons for denying Premier's third plat application, the City repeated this statement and added that "[t]he City's general plan, *as reflected in its existing streets and bridges* that provide vehicular and pedestrian access, is not adequate for, and does not contemplate the construction of a large dry-stack boat storage or other similar large-scale commercial activity at the location of the property" (emphasis added).

But, the City Parties do not identify any general plan or existing regulations that were ostensibly applied to the Project.[4] Nor do the City Parties attach any evidence to their plea. The City Parties likewise make no attempt to explain their vague reference to a denial based on a general plan that is "reflected in its existing

---

[4] In its certifications, the City also repeatedly identified provisions of a "Code of Ordinances" as another basis for alleged noncompliance, but no such code appears in our record. The City Parties do not claim that this Code of Ordinances, which Premier alleges concerns building codes and related matters, existed before Premier filed its initial plat application. Nor do the City Parties offer any argument as to why a subsequently enacted ordinance governing building codes should limit Premier's vested rights. Premier relies on *Town of Lakewood Village v. Bizios* to argue that "building codes" are not the equivalent of "rules governing plats and subdivisions" under chapter 212 and thus are inapplicable to Premier's plat applications. *See* 493 S.W.3d 527, 532–33 (Tex. 2016). The City Parties do not respond to this argument.

streets and bridges." Nor do the City Parties contend that the initial plat application failed to meet any required technical requirements for plat applications. *See id.* § 245.002(f).

We are aware of no authority that authorizes a general-law municipality like the City to rely on an unwritten "general plan" that is immune from review to deny a permit applicant's vested rights in a project. Further, such a plan appears inconsistent with the Local Government Code, which contemplates that a municipality's rules, regulations, and other requirements are effective only upon their adoption after a public hearing. For example, chapter 212 provides that "[a]fter a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality." *Id.* § 212.002. Section 212.044, which specifically references the adoption of general plans, similarly provides:

> *After a public hearing on the matter, the municipality may adopt general plans*, rules, or ordinances governing development plats of land within the limits and in the extraterritorial jurisdiction of the municipality to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

*Id.* § 212.044 (emphasis added). Section 212.044's requirement that a general plan be adopted after a public hearing is also consistent with chapter 213, which requires that a city's comprehensive plan also must be formally adopted after a public hearing. *See id.* §§ 213.002, 213.003(a). And chapter 211 provides that zoning regulations are "not effective until after a public hearing on the matter at which parties in interest and citizens have an opportunity to be heard." *Id.* § 211.006(a). Moreover, chapter 245 allows a city to consider only "any orders,

13

regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect" when the first permit in a series is filed. *See id.* § 245.002(a).

Thus, although the City Parties maintain that they repeatedly rejected Premier's plat applications on the basis of "existing regulations" and not the subsequently enacted Ordinance, the City Parties have presented no argument or evidence to support their allegations. The City Parties instead primarily rely on an alleged "general plan" to deny approval of Premier's plat applications, which just happens to reach the same result as would applying the Ordinance. Moreover, the City Parties have not alleged or presented evidence that the other reasons for denying Premier's plat applications were either in effect before Premier submitted its initial plat or are applicable.

In contrast, Premier has alleged that the City had no general plan at the time it submitted its initial plat application for a marina development that included residences and dry boat storage; Premier's rights in the Project vested on April 22, 2010, when Premier submitted the plat application to the City; within days of Premier's submission, the City Parties enacted the Ordinance specifically to prohibit the Project; and, since then, the City Parties have repeatedly denied every revised plat application Premier has offered based on an unwritten "general plan" and other reasons that either were not in effect at the time the Project vested or are inapplicable to a city's consideration of plat applications. Premier supports its allegations with its plat applications, the Ordinance, and the City's certified reasons for denying each plat application.

Additionally, in opposition to the City Parties' plea, Premier submitted the affidavit of Jennifer Hoff, a senior vice president of IBC and a vice president of Premier. In her affidavit, Hoff averred that, among other things, Premier paid $5.7

14

million for the Property in February 2009; Premier always intended to develop or market the Property for development as a marina with, among other things, elevated dry boat storage; the City had no zoning ordinance and had not adopted a comprehensive plan at the time the plat was filed; and Hoff believes that the Ordinance was adopted in an attempt to "prevent Premier from developing dry boat storage" in the City.

Thus, despite the City Parties' representations to the contrary, a dispute exists concerning the primary jurisdictional fact on which the City Parties rely: whether the City Parties have properly denied Premier's plat applications based on regulations that preexisted Premier's initial plat application or whether the City Parties have improperly refused to recognize Premier's vested rights in the Project by denying Premier's plat applications based on subsequently enacted ordinances, rules or regulations, or other reasons that are inapplicable or irrelevant. We therefore reject the City Parties' argument that Premier has not pleaded a claim to which chapter 245 applies.

### 2. *Premier's request for declaratory judgment is ripe.*

The City Parties next contend that Premier's claims for enforcement of chapter 245 are not justiciable because they are not ripe. In particular, the City Parties maintain that because they have not yet applied the Ordinance to the Project, no justiciable controversy has yet arisen. Additionally, the City Parties argue that because they have conceded that the Ordinance was enacted after the first plat application was received and that, under chapter 245, the City Parties are prohibited from applying the Ordinance to the Project, a declaratory judgment regarding the applicability of the Ordinance could do no more than state that which is undisputed.

As we have already explained, Premier seeks a declaratory judgment to

confirm the existence and extent of its vested rights to develop the Project and to determine what aspects of the City's regulatory scheme apply to the Project.[5] Premier's petition and the evidence show that the City Parties have had multiple opportunities to determine the existence and extent of Premier's vested rights in the Project in Premier's extensive negotiations with the City Parties, two amendments to Premier's plat application, and its submission of a PUD application as provided in the Ordinance. Premier has also alleged and presented evidence that further applications would be futile, as the City Parties have now denied Premier's initial and successive plat applications three times based on substantially the same certified reasons. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 929 (Tex. 1998) ("[F]utile variance requests or re-applications are not required.").

Absent a judicial declaration, Premier alleges that it cannot move forward with its Project as conceived or sell the Property to anyone else for development of a similar project. And, contrary to the City Parties' assertion, Premier's claim for declaratory relief is not based solely on the Ordinance; instead, Premier asks for specific declarations that its vested rights permit it to develop the Project as a multi-use facility that includes, among other things, dry boat storage and apartments.[6]

---

[5] In its live pleading, Premier requested the following declarations: "(i) the Vested Project is vested under Chapter 245 as of April 22, 2010; (ii) the Vested Project is property described in the Plat, specifically included Plat Notes 9–13; and is vested under Chapter 245 and, therefore, dry boat storage is a permitted use; (iii) any provisions of the Ordinance that could inhibit the development of the Vested Project through property classification do not apply to the Vested Project, including but not limited to (a) limitations on the permitted or listing of the prohibited uses and (b) PUD requirements; (iv) any provisions of the Ordinance that could inhibit the development of the Vested Project related to building size do not apply to the Vested Project, including but not limited to (a) height, (b) setback, and (c) parking; and (v) any provisions of the Ordinance that could inhibit the development of the Vested Project related to (a) landscaping or tree preservation, (b) open space or park dedication, (c) lot size, (d) lot dimensions, (e) lot coverage, do not apply to the Vested Project."

[6] In its reply brief, the City Parties suggest that Premier's request for declaratory relief is

16

On this record, Premier has demonstrated that a justiciable controversy exists that requires judicial resolution. Moreover, chapter 245 specifically authorizes a declaratory judgment action for this purpose. *See* Tex. Loc. Gov't Code § 245.006(a); *FLCT, Ltd. v. City of Frisco*, 493 S.W.3d 238, 251–52 (Tex. App.—Fort Worth 2016, pet. denied) (holding that property owner's declaratory judgment action to determine the existence and extent of its vested rights under chapter 245 to develop a convenience store on its property was ripe and presented a justiciable controversy concerning whether the city could impose local ordinances prohibiting sales of beer and wine even though no beer and wine license application was pending); *Cont'l Homes of Tex., L.P. v. City of San Antonio*, 275 S.W.3d 9, 20 (Tex. App.—San Antonio 2009, pet. denied) (holding that owner's counterclaim for declaratory judgment was ripe and thus presented an actual controversy over whether the owner had vested rights to develop property under ordinances in effect at the time of vesting and owner also sought recognition that all future development was governed by all ordinances, not merely a particular ordinance). We hold that the trial court did not err in denying the City Parties' plea to the jurisdiction and overrule the City Parties' first issue.

---

unnecessary because the City Parties agree that the trial court has jurisdiction over Premier's mandamus claim directed to the parties' dispute over whether the Board was justified in denying Premier's plat applications. Thus, according to the City Parties, the declaratory judgment action will resolve nothing because the City acknowledges that Chapter 245 applies and that the City cannot enforce the Ordinance against the Project. On this record, however, Premier has alleged facts supported by evidence contrary to the City's assertion that it agrees with the declaratory relief Premier seeks, and therefore the resolution of this issue is required before the trial court can determine whether the Board may be compelled to perform a ministerial duty to approve the plats as Premier requests. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex. 1991) (stating that a writ of mandamus may issue to compel a public official to perform a ministerial act and explaining that an act is ministerial only "when the law clearly spells out the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion").

## II.    Premier's Takings Claim

In its second issue, the City Parties contend that the trial court erred in denying their plea to the jurisdiction because Premier failed to plead a viable regulatory takings claim. Specifically, the City Parties complain that Premier fails to plead a viable takings claim because (1) the Ordinance was not applied to the Property, (2) the claim is not ripe, and (3) Premier has not pleaded facts to support its legal conclusions concerning the City Parties' allegedly unreasonable interference and the existence of any investment-backed expectation.

### A.    Standard of Review and Applicable Law

The Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Similarly, Article I, section 17 of the Texas Constitution provides, in pertinent part, that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." Tex. Const. art. I, § 17.[7] Governmental immunity is waived for valid takings claims. *El Dorado Land Co. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013).

Premier does not allege a physical taking of the Property, but instead alleges that the City Parties have intentionally taken Premier's vested property right to market, develop, and/or use the Property as a marina with elevated dry boat storage without Premier's permission, without adequate compensation, and for public use. Accordingly, Premier has alleged a regulatory taking based on an unreasonable interference with its right to use and enjoy its property under the "*Penn Central*" factors. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978);

---

[7] We consider the federal and state takings claims together, as the analysis for both is complementary. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012).

*Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672–73 (Tex. 2004); *see also City of Houston v. Maguire Oil Co.*, 342 S.W.3d 728, 735–36 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (discussing the multiple distinct theories a plaintiff may invoke in challenging a government regulation as an unconstitutional taking).

A "*Penn Central*" takings claim may arise when a governmental entity has denied a landowner approval to develop his property. *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 644–46 (Tex. 2013) (applying *Penn Central* factors to developer's regulatory takings claim that city approved landowner's subdivision plat and subsequently enforced a moratorium against the property); *Mayhew*, 964 S.W.2d at 935–36 (applying *Penn Central* factors to town's rejection of landowner's development plan). In *Penn Central*, the United States Supreme Court identified three key factors to guide our analysis: (1) the economic impact on the claimant; (2) the extent of interference with the claimant's investment-backed expectations; and (3) the character of the government's action. *City of Lorena*, 409 S.W.3d at 644 (citing *Penn Cent.*, 438 U.S. at 124). In addition to these factors, we should consider all surrounding circumstances. *See id*. The extent of the governmental intrusion may be a question for the trier of fact, but whether the facts alleged constitute a taking is a question of law. *Sheffield*, 140 S.W.3d at 673.

## B.     Application of Law to Facts

### 1.     *Premier has alleged facts to support a taking based on the denial of its vested rights in the Project.*

The City Parties first complain that Premier's allegations are insufficient to allege a takings claim because the Ordinance was not applied to the Property. We have already explained in detail that despite the City Parties' repeated assertions that they have not applied the Ordinance, Premier has alleged facts supported by

evidence that raise a fact issue concerning whether the City Parties' repeated rejections of Premier's plats are based on legitimate reasons or the City Parties' refusal to recognize Premier's vested rights. Additionally, Premier points out that before it purchased the Property, the previous owner was in the process of constructing a marina with dry boat storage. After that project was destroyed during Hurricane Ike, Premier purchased the Property from IBC for use as a marina with dry boat storage. The City Parties do not contest this allegation. Viewed in the light most favorable to Premier, the existence of a similar marina development in the area before Premier acquired the Property supports Premier's assertion that the City had no existing regulations prohibiting such development at the time Premier purchased the Property.

### 2. *Premier's regulatory takings claim is ripe.*

The City Parties next assert that Premier's claim is not ripe because its live pleading affirmatively demonstrates that the City Parties did not apply the Ordinance to the Property, and therefore the City Parties have not made a final decision concerning "the extent of permitted development" under the Ordinance. We have rejected the City Parties' cursory ripeness argument in our discussion of Premier's declaratory judgment action and the same analysis applies here.

### 3. *Premier has pleaded facts to support its legal conclusions.*

Lastly, the City Parties argue that Premier has not pleaded facts to support two of its legal conclusions. According to the City Parties, Premier has failed to allege facts to support its claims that any interference by them was unreasonable and that an investment-backed expectation existed.

#### a. *Unreasonable interference*

The City Parties assert that Premier has not pleaded facts to support its legal

20

conclusion that any interference by them was unreasonable because "[t]he mere fact that a regulation has destroyed the most profitable use of property does not establish a compensable taking," citing *Edwards Aquifer Authority v. Bragg*, 421 S.W.3d 118, 139 (Tex. App.—San Antonio 2013, pet. denied).

According to the City Parties, Premier alleges no more than that the City's regulations prevent it from pursuing one particular type of development that would include a large, multistory dry stack boat storage facility. The City Parties maintain that the City's denials of Premier's plat applications does not establish a taking because Premier "has never pursued any alternative developments." The City Parties cite no authority for the proposition that Premier is obligated to propose or undertake some other, unspecified type of development that differs from Premier's investment-backed expectations before Premier may allege a viable takings clam. Indeed, "[t]he existing and permitted uses of the property constitute the 'primary expectation' of the landowner that is affected by the regulation." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012) (quoting *Mayhew*, 964 S.W.2d at 936).

In this case, Premier claims it has a vested property interest in the use and enjoyment of its property as dry boat storage when it filed its plat application on April 22, 2010, and that dry boat storage buildings were permitted when Premier's rights vested. Premier alleges that the City Parties have "created a direct restriction on Premier's use of its property, and has unreasonably interfered with Premier's use and enjoyment of its property." In support of its allegations, Premier incorporates the facts alleged in its petition, including the following: the City had no zoning Ordinance or other duly adopted ordinances or plans that would prohibit dry boat storage when Premier's rights vested on April 22, 2010; the City subsequently adopted the Ordinance prohibiting dry boat storage buildings; the

City has since rejected Premier's initial platting application and two revised platting applications based on one or more zoning ordinances or on items that are either not duly adopted, irrelevant, or inapplicable; and the City's actions have followed years of negotiations and litigation that have caused Premier to suffer an uncompensated taking of private property well in excess of $2 million.

Premier has also supported its allegations with evidence including its initial and amended plats, the subsequently enacted Ordinance prohibiting dry boat storage, the City's three certifications of reasons for rejecting Premier's plat applications based on the included dry boat storage, and the affidavit of Premier's vice president, Jennifer Hoff, who averred that that the City's refusal to approve the Project "has resulted in Premier's inability to either construct a marina with elevated dry boat storage or market the Property as a marina with elevated dry boat storage which was Premier's intention when it acquired the Property."

In response, the City Parties merely deny that they have applied the Ordinance and otherwise assert only that the City rejected Premier's plat applications primarily based on "existing regulations." But the City Parties have presented no evidence of these "existing regulations" or any of the other asserted grounds for repeatedly denying Premier's plat applications.

Construing Premier's pleadings liberally in favor of jurisdiction, looking to Premier's intent, and accepting the allegations in the pleadings as true, we conclude that Premier's petition adequately alleges that a taking occurred through regulatory action that unreasonably interfered with Premier's right to use and enjoy its property. *See Vill. of Tiki Island v. Ronquille*, 463 S.W.3d 562, 576–77 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that homeowner adequately pleaded that city's ordinance prohibiting short-term rentals inexcusably interfered with her right to use and enjoy her property when her pleadings alleged that short-

22

term rentals were permitted before the ordinance was adopted; she relied on city officials' assurances that short-term rentals were permitted; the ability to rent short term was a major part of her decision to purchase her house; the ability to rent short-term enhanced the value of her property; and the prohibition on short-term rental decreased the value of her property).

### b.     *Investment-backed expectation*

Second, the City Parties assert that Premier has failed to plead any facts to support any investment-backed expectation at any relevant time, namely when Premier's affiliate, IBC, loaned money to Faidi. The City Parties maintain that Premier has failed to plead any factual allegations that IBC loaned the money to Faidi with an investment-backed expectation that the Property would include dry stack boat storage. The City Parties do not explain why such an allegation is necessary, as IBC was not then the property owner. Nor do the City Parties explain why it is significant that Premier was IBC's affiliate when IBC foreclosed on the Property and subsequently conveyed it to Premier.

Contrary to the City Parties' contention, Premier's petition includes the following allegations to support its claim of an investment-backed expectation:

> At the time Premier acquired the Property, it had a reasonable investment-based expectation . . . to develop and/or market the Property as a marina with elevated dry boat storage. Shortly after acquiring the Property, Premier began marketing the Property and receiving offers to purchase the Property. Both Premier's marketing attempts and offers to purchase the Property included elevated dry boat storage. It was Premier's intention to profit from the sale of the Property or from the development of the Property itself.

> Through Premier's marketing campaign to sell the Property as a marina with elevated dry boat storage, it received offers to purchase the Property from many entities, including, but not limited to: Ersa Grae Corporation; Amerifund Capital Group, LLC; Claremont

23

Property Company; The Fingers Companies; United Equities, Inc.; AmeriFund Capital Development, LLC; M. Nasr and Partners; P.C, Rose Properties, Inc.; Vintage Development Group; Seven Kings Holdings; Atlantic Marine; Isis Investments, LP; and Thomas F. Noons. One such offer was for the purchase price of $10,000,000.

. . . Importantly, none of these offers . . . were consummated due to the fact that [the City] and the Aldermen interfered with Premier's vested rights and intention to market the Property as a marina with elevated dry boat storage. . . . To this day, Premier still cannot sell the Property in accordance with its vested rights as [the City] refuses to allow Premier to develop the Property with elevated dry boat storage. This has resulted in significant adverse economic impact to Premier as Premier cannot sell or develop the Property as a marina with elevated dry boat storage.

Premier also alleges that the City Parties' actions have amounted to years in which Premier has been unable to use and enjoy its property and that the City Parties have interfered with Premier's investment-backed expectations by improperly attempting to enforce subsequently enacted statutes and regulations against Premier. Premier's allegations are also supported by Hoff's affidavit.

We conclude that Premier has adequately pleaded a viable takings claim by alleging that at the time it acquired the Property, it had a reasonable investment-backed expectation to develop or market the Property as a marina with elevated dry boat storage, and that the City Parties have interfered with Premier's investment-backed expectations by repeatedly denying Premier's vested rights to its Project based on items irrelevant to plat applications or ordinances adopted after Premier's rights vested. *See id.* at 577–78. We overrule the City Parties' second issue.

24

## CONCLUSION

We overrule the City Parties' issues and affirm the trial court's order denying the City Parties' first amended plea to the jurisdiction.

/s/    Ken Wise
Justice

Panel consists of Justices Christopher, Donovan, and Wise.